Our first matter is Montgomery v. Orange County. That's case number 25-180. Mr. Fitch, you have reserved two minutes. Is that correct? That's correct, Your Honor. Okay. Well, when you're ready, you may proceed. May it please the Court? Good morning. Your Honor, plain disposition, as I've outlined in the brief, is that the District Court erred in several ways, but one particular way that I believe colored the entirety of the decision was the District Court's seeming failure to, or refusal to, recognize the different theories of liability in this case. The principal theory is a municipal policymaking liability against Orange County and the sheriff as principal policymaker, and there is a second theory of liability against individual correction officer, Defendant Hankins. Can we start with Hankins? Sure. So, even if you had facts to allege negligence, do they really allege that he knew that he was facing an excessive risk, that Mr. Montgomery was going to be threatened and injured like that by Thomas? Well, I think under Farmer, Your Honor, given the allegations and the pervasiveness and known dangerousness and persistent use of weaponized water as an often used modality of ending violence. Maybe you can help me by putting the precise point. Like, where did you think he knew that there was substantial risk? When he was microwaving it? When he walked over? Where did it go from negligence? I think in both of those instances. If you have a prison guard who knows that inmates use weaponized water to attack other inmates, if that is a premise, and I believe that's alleged sufficiently, if a correction officer was supervising a day room where a microwave is being used by an inmate for seven to eight minutes to heat a plain cup of water to do nothing. So you're assuming, though, that there was not enough activity in the room, that that is a detail he would have paid attention to? Well, it's not alleged, Your Honor, so it's not an assumption that I believe can be made on 12B6 against plaintiff. It is perhaps a fact that might be adduced during discovery that might absolve him of liability if he could prove that somehow he was distracted or there were too many things going on. But it is alleged that he was in full view of this, saw what was going on. It was heated in his presence for an inordinately long period of time, and he did nothing. And then afterwards, he took the boiling cup of water out of the microwave, walked aggressively towards another inmate, bypassing the station where Hankins was stationed at observing the day room, and then poured it all over an inmate. So maybe I can ask the question a bit more abstractly, then. What does it mean for there to be a risk, to be obvious, for the purposes of the first part of the farmer prong? Well, I think farmer speaks to awareness. So if the risk, all we have to do is prove defendant's actual awareness of risk. Now, there is a component of farmer, certainly in its explicit language, that suggests some risks may be so obvious that they need no outside proof. I would submit, perhaps in a penological context, allowing inmates to use glasses or metal knives in a cooking or eating setting would be something that is so obvious that no prison official would allow at this point. So is the position that it was constitutionally violative for them to allow a microwave at all? No, Your Honor. Okay, then let's walk that back. So it's not that. Is the allegation that they have to supervise the use of it in a way that deals with, what, the time that they're putting in for the item to be heated, or what? What is it that crosses the line from negligence to unconstitutional behavior? Well, I don't think that they need to ban the use, although many facilities, as I've alleged, do ban the use nationwide and statewide. But that's not your position. True, Your Honor. Okay. But it is alleged that they have no safety protocols whatsoever. Whether the safety protocols come in the form of more guards specifically stationed at the microwave, time limits for the microwave, sign-ins for the microwave, some specific or heightened supervision around items that are capable, readily capable, of creating weapons that are known instrumentalities of inmate violence. That's what I would suggest. Well, let me ask you then. The allegation at paragraph 46 of the complaint is that upon information and belief the cup of water had been microwaved for approximately 7 to 8 minutes. What's the good faith basis for that assertion as opposed to 3 or 4 minutes, 4 or 5 minutes? What's the good faith basis for 7 to 8 minutes? The plaintiff's allegations, Your Honor. The plaintiff himself who was in the facility. But it's not pled on his knowledge. It's pled upon information and belief. I don't believe I'm required to set forth who. No, but you do need a good faith basis. That is my good faith basis. Right. And the good faith basis is that you expect your client will testify that it was put in for 7 to 8 minutes? Yes, Your Honor. Okay. Now. Not to mention, Your Honor, I'm sorry to interrupt you. I believe that all of this is caught on, I believe there's surveillance videos within the facility as well. Which shows that it's 7 to 8 minutes? It would certainly show the time limit, the time that it was. Well, I mean, you've seen it and we haven't. So I'm asking. I have not. I have not. That's the thing. We haven't gotten any discovery in this case. I wish we were. I see. So you're assuming that the video would show that. Once again, information that I've received from plaintiffs that there are surveillance videos within the facility. Okay. Well, as you said, there are different standards for different defendants in this case. With respect to the sheriff individually, you're not alleging that he knew it was put in for 7 to 8 minutes as opposed to 2 to 3? No. Nor do I think it's required because he is, by definition, the policy maker for the county. And so what policy should have been in place that you're saying he didn't put in? As I explained, I believe there needed to be some level of supervision specifically as to the use of the microwave. Not simply an officer stationed within a large communal day room observing all activity. An officer specifically assigned to the activities around the microwave. Or some other form of restriction on microwave use by inmates. Again, whether it's a sign-in sheet, whether it's a time limit. A sign-in sheet wouldn't have affected this particular injury, right? Perhaps not, Your Honor. But a time limit on the microwave certainly would have. And an officer stationed at the microwave, I would imagine, certainly would have because they would have seen the amount of time they're heating a plain cup of water. And again, I know it's a small distinction, but I don't know many people, I haven't come across many people in my life that drink hot water by itself. Without coffee, without making soup. Something that they're using the hot water in connection with. As I understand it, he heated a plain cup of water, took that plain cup of water when it was at boiling, walked it over aggressively to the plaintiff. Did they have tea bags there for people to boil water? No, you're saying you don't know people who microwave water. And I'm asking you if that, it seems to me that's a frequent thing for people who are drinking tea. Sure, Your Honor. I don't, there's no allegation that there was tea being used. I'm talking about a scenario where it's just water. Where they're just drinking piping hot water.  I just want to, before you sit down, I want to know what we're dealing with. Is the 8th Amendment or the 14th Amendment and why? I think that potentially is an open question, Your Honor. I mean, under Darnell, if you're a pretrial detainee, it would be the 14th Amendment. Under Farmer, if you're a sentenced inmate, it's the 8th Amendment. He happened to occupy both spheres in this case because he was a misdemeanor sentenced inmate on a short sentence. And he was also a pretrial detainee on a misdemeanor charge in Orange County. I would say also with respect to the distinction between Monell and individual liability, there is certainly a suggestion in Farmer and Outer Circuits that suggests that the mens rea component for a municipality is, I believe the term they use, there would be considerable difficulty in assessing a subjective state of mind of a governmental entity, which is one of the claims here. So I think if that is true, then it would be a Darnell standard as to the municipality, regardless of whether it's under the 8th or 14th Amendment. And so how do you think the outcome would be different? Well, certainly, Your Honor, I don't think the outcome should be different in this case. I think the court simply ignored or washed away facts that would have established awareness, whether it's based on the should have known or must have known. We're talking about municipal defendants who have a proactive, under this court's precedent, a proactive responsibility to create protocols and safety procedures for the inmates that were well aware of the longstanding use of weaponized water, the more frequent use within the state over the past year, and its popularity as basically the second most used method of inmate violence. And they essentially washed their hands of any protocols whatsoever with respect to an instrument like a microwave and access to that, which can be easily used to create this weapon. I mean, stingers are typically a contraband because they've banned heating elements, and inmates have to use makeshift heating devices to heat their water to create these weapons because the prisons know how dangerous it is. Thank you. Thank you, Your Honor. If you don't mind starting where I asked your colleague, are we talking about an Eighth Amendment or a 14th Amendment, and what would be the difference? Yes. You can lower the lectern if you like. There's a button right there that helps you lower it. Down? Yeah. Oh, thank you. Got it. Yeah, stark difference. Okay. May it please the court. The district court properly dismissed the underlying complaint by granting the defendant's appellee's motion to dismiss in this case. As to the standard, Your Honor, the Eighth Amendment analysis must apply here. Here we know that all the allegations in question were at the time that the plaintiff was a sentenced inmate, and thus under Darnell v. Pinheiro, it's clear that the Eighth Amendment deliberate indifference analysis applies. Using that analysis, it's a two-pronged approach that plaintiff pleads non-conclusory allegations that, one, objectively show that plaintiff was incarcerated under conditions posing a substantial risk of harm, and, two, subjectively demonstrating that defendant prison officials had sufficient culpable conduct, or, in other words, that the prison officials actually knew of and disregarded an excessive risk to plaintiff's safety. How would you define what it means for a risk to be obvious? Yes, Your Honor. So the risk to be obvious, I place that under the subjective prong, and in that case we know from Farmer v. Brennan that knowledge of a substantial risk of harm can be established by the very fact that the risk is obvious, but I submit to this court that the allegations here do not rise to that. So why don't we focus on the obvious? What does it mean for a risk to be obvious pursuant to Farmer v. Brennan? I believe that the case decided by plaintiff in the briefs, when an obvious risk of a risk is pinpointed, it's typically to a standalone weapon or an inherently dangerous object. Here it's two steps to get to the, quote, weapon that was used in the assault, the hot water. We have the use of the microwave and then taking the water that's in the microwave and then using that in the assault. Well, that's for the individual correction officer. How does that apply to either the sheriff or the county? Your Honor, I would submit that the obviousness for the county still requires some history of prior knowledge or prior history of attacks in order for it to be a subjective obviousness. So even in the case of the sheriff where there is no prior history of similar attacks, it cannot be said that to be subjective to those circumstances and to that facility. You don't think a reasonable person would know that if you're going to use a microwave to heat water and you put it on seven to eight minutes, that's going to create a dangerous situation? Your Honor, I think that the Constitution does not require that prison officials anticipate and eliminate all risks of harm within the jail setting. Do you think you could give prisoners steak knives? Your Honor, I do not believe. I believe that's already identified as contraband. Here, a microwave is not identified as contraband, of course, because it's in the database. Well, that gets to whether it should be identified, used in certain ways, as a potentially dangerous item. And so what I'm asking you is your adversary, as I understand it, we have to view the facts and the like most favorable to the plaintiff as alleged right now, says that there were no limits on how long you could heat water. And as a result, you basically were creating a situation where people would be scalded if they served, that the plaintiff was seriously scarred. Now, I'm asking, you don't think it's obvious that if you can put a liquid in a microwave for upward of five minutes that you're creating something that can be used to harm someone? Your Honor, absent any allegations to establish a history of prior similar attacks, I would submit that in this case it is not an obvious risk. When we look to the four, there's four principal allegations here that make up plaintiff's argument that this is an obvious risk of harm. It is first the New York State Department of Corrections and Community Supervision report, which is a report that deals specifically with violence in state prisons. And we know that the case law has shown that. I'm sorry, but is that really a distinction with that? Is that a meaningful distinction? I mean, why would there be something different about these particular incarceration options as opposed to state prisons? Your Honor, when you look at the report and the allegations within the report, it never mentions hot or boiling water as a weapon that was used in the DOCS facilities. So even assuming that this knowledge in DOCS facilities can be imputed onto a county sheriff, it's an inference that you have to make that the weaponized liquid is, in fact, hot and boiling water. And further, I would submit to you that the report— Wait a minute. I'm sorry. So you're saying that there was some other access to hot, boiling water that wasn't a heating implement like a hot pot or a microwave? Your Honor, I submit to you that the report is actually with regard to weaponized liquids in general in DOCS facilities and doesn't specifically identify hot or boiling water, nor, again, the specifics of this assault. What other liquid do you think people would go, Aha, soup, coffee, whatever, but wouldn't have occurred to them water? What other liquid do you think they had notice of but not water? Your Honor, I think that if there is an inmate operating with its own intention to hurt another, liquids can be used— Well, stick with what you just said to us, that they had noticed that other liquids were used to cause injury but not water. And I'm trying to think of what other thing they had that wouldn't have caused them to think, Ah, water, too, would be a problem. Your Honor, it's not just water. I meant in general the temperature of the water. What did they have notice of? What did they have notice of that was the liquid used for injury? Your Honor, I would submit to you that under this report, they had no knowledge of any substantial risk of harm. Isn't the report—doesn't the report post-state the incident, though? Isn't the docs report subsequent to the incident that occurred here? Your Honor, I don't believe I have that information right in front of me as to the date of the report. But, again, I think— So one of them was the report, and then the other was what? So the next allegation is the fact that there is prison slang or prison jargon for the use of certain heating elements and or hot water. So I submit to you that I think that the case— there's no case law to support that prison jargon could be sufficient allegations in order to form a generalized risk of harm. And in any event, I submit to you that just really the allegation that hot water exists or in prison jargon just tells us that an inmate somewhere nationwide— Okay, well, I'm sorry. So I felt like I just heard you. So one of them was the report. Yes. One of them is that they have a term for it. One of them was the dozens of incidents using hot liquids to assault people. Yes, Your Honor. And then one of them was the fact that there are prisons that deny inmates access. Why are those four things not enough? I mean, I can understand you quibbling with any one of them, but why together are they not enough? I submit to you that they're not enough because I think the case law has been clear that each instance of those allegations in this particular case was not enough to create a subjective risk of harm without the history of similar attacks. Well, you're focusing on the subjective, but there is an objective part, right? Yes. So would you at least concede that the objective part was met by these four things? No, Your Honor. I believe that the objective part also requires— at least the cases that have spoken directly on the issue— requires some type of longstanding, pervasive history of attacks to be sufficiently aligned with factual specificity. Here, the allegation that Orange County Correctional Facility has had instances, dozens of instances of violence using hot water, quote, over the years, I would submit to you is entirely conclusory. But it's not enough with that other stuff for a motion to dismiss? No, Your Honor. I would submit to you that it is not enough because if even taken together, these allegations exist in an everyday context of a penological setting. So even taken together, it would create the fact that any item taken in a penological setting that's fashioned into a weapon would be sufficient to move forward with an Eighth Amendment claim. And I submit to you that's not the purpose of the deliberate and different analysis, even at the motion to dismiss stage. Let me ask you about some of the specific allegations because then I would hope that your adversary would respond to them too. Now, there's this 2023 docs report, but the incident here is December 2022, correct? Yes, Your Honor. I think this is the report that Judge Wesley may have been asking you about. There's only one report. You said you couldn't tell, but it's 2023. Right. On the other hand, there's also the allegation that OCCF has had dozens of incidents of violence using hot and or boiling water to commit assaults against inmates. Now, your argument as to why that allegation is not enough to survive dismissal, I want to be sure I understand what your point is. Yes, Your Honor. My point with that allegation is that without the who, what, where, or when, some basis of factual specificity to go with that allegation, it's entirely conclusory, and this court need not credit such conclusory allegations. Well, you're saying it's conclusory because the plaintiff asserts it but doesn't attribute it to a report or an official finding or anything like that. That's what you're saying is that it's a conclusory assertion by the plaintiff? Yes, Your Honor. It's a conclusory allegation by the plaintiff, and I believe under the standard, without some history of similar attacks in this facility, they are unable to meet the objective of subjective problems. He's not talking about other attacks on him, nor does he say this was at the facility he was at, so he doesn't have direct knowledge. Is that your view on why he can't assert it conclusorily? Yes, Your Honor. I submiss you, and that's specific to his personal knowledge. If this was, in fact, such a prevalent issue at Orange County Correctional Facility, it would bet to the question, again, why plaintiff himself and his direct knowledge wouldn't have knowledge of a single other instance where microwave was used to heat up hot water and then attack another inmate. Are you good? Yeah. Okay, so I want to talk about two particular questions. Do we need to find that Hankins violated Mr. Montgomery's constitutional rights in order to find that the county or the sheriff did? With regard to the Monell claim, Hankins would be one way that you can establish a Monell claim in this. Of course, the Monell claim is the municipal liability that is extending from some type of individual conducting a constitutional violation. The sheriff also, this court clarified the standard for personal involvement again in its 2020 Tangredi decision, and there, as a policymaker, Sheriff Du Bois can be found also to have a constitutional violation and then extend Monell therefrom, but only if he also participated in an actual constitutional violation. Okay, so the answer is we can still find the sheriff in the county, even if we decide to not find that the individual correction officer was. Yes. I submit to you that it's not just on the basis of a lot of cases. I totally got it. And then can you walk me through how you think you still prevail if we disagree with you and that we think it's to be analyzed under the 14th Amendment? Your Honor, I will submit to you that the allegations, again, the report, the prison jargon, other cases where this type of attack has happened, and the conclusory allegation of the dozens of instances still don't create a should have known, a known or should have known circumstance in this case. Sure, the specific risk of harm is clear, but even with the general risk of harm, the substantive or subjective rather obvious risk of the risk here should not be established just because a report exists about the state prison system or just because somewhere an inmate has referred to a specific object in the facility by some other name. It is too high of a burden, I submit to you, that it's not what the 8th Amendment Deliberate Indifference Analysis or the 14th Amendment Deliberate Indifference Analysis intends on because it would require our prison officials to then, in that case, anticipate and try to eliminate all risk which is not possible in a penological setting, Your Honor. Thank you. Thank you, Your Honors. Your Honors, just one point of clarification. Questions were asked about the docs report. It is a 2023 report, but it was published in 2023. The relevant period is reporting period. It's 2023. Yes, it was published in 2023, but the reporting period is from incidents from 2021 to 2022. No, but how do you expect the sheriff to know? He's not in the docs system. He's in a separate county court system. How do you expect the sheriff to know a docs document before its publication date? You can't impose notice on him about a generally published document and say he should have known about it and then say, well, he should have known generally about the information because somehow he would have been talking to docs? It's not docs, Your Honor. Docs documents facilities throughout New York State. The idea that the sheriff somehow… Is the docs document related to docs facilities? You're all correct. Or any institution, housing, individuals? It's docs facilities, but all facilities are required under law to report incidents to docs. You didn't answer my question. Does the docs report relate to docs facilities or in any facility, county or state, which houses individuals? This particular report relates just to docs facilities. Okay. So it expresses the risk in a state correctional facility where felons are housed, correct? Right. And this is a county facility. Someone with a DWI who is doing time locally is in that facility, is that correct? As well as felons. Someone who steals a newspaper is in that facility. As well as felons, Your Honor. And ICE detention inmate. Felons serving a sentence of less than a year? No.  Misdemeanors serving a sentence of a year or less. Yes. Felons awaiting trial. Sure. And as I understand it, sentence felons as well to some degree before they are shipped off state. As well as federal inmates subject to immigration. Even federal felons awaiting trials in federal court elsewhere. Well, certainly immigration detainees are in that facility as well. I just wanted to clarify that the relevant, we're not talking about acts that post-date this incident. We're talking about a report that was published post this incident. And I find it to be the inference that OCCF superintendents who have a proactive duty to know what's going on, not only their own facility. Are somehow operating in a vacuum. That they don't know what's happening in any other state or federal facility. To me, is not a reasonable inference. Is that because the reported incidences are available in some database that you haven't alleged in your complaint? I believe that it's reasonably inferable that policy makers for states, local facilities are sharing information. Well, you alleged a document which was published, but you didn't allege anything else, did you? No, it's an inference that should be drawn from the allegations, I believe. In that regard, may I ask you when in paragraph 29 of the complaint you talk about dozens of incidents using hot end or boiling water. Is the support for that the 2023 report? No, that would be plaintiffs and frankly, inmate to inmate information, your honor. And I would address that that is not, again, the district court called that a conclusory statement. But Iqbal and Twombly made very clear what the difference between a conclusory and factual allegation are. That is an allegation of fact. The idea that we need to come forward with support is antithetical to this court's jurisprudence. Especially where the information is uniquely known to defendants, that plaintiff has some proactive discovery duty to obtain the specifics of these information. He must be afforded at the pleading stage a presumption of truth. This is a factual allegation that should have been deemed true without further support, without further specificity. And the court should not have applied a believability standard to this or a proof standard to this. Let me ask you this. The problem is, so now we've got inmates talking to each other. And is there anything in the complaint that indicates that what they were saying was that it happened at the facility where this particular incident occurred? Let's start with that. The allegation itself is saying that there were dozens of prior incidents at OCCF. The where that information came from I don't believe is required under 12B6 unless there's a new standard that I am aware of. You see, to the extent that we're trying to decide whether or not the superintendent at this facility and the guard who was on duty on that date should have been aware of the danger. I'm trying to ask first, is there anything to suggest that these dozens of incidents that any one of them have happened at this facility? Yes, Your Honor. The allegation states at OCCF. Well, that doesn't tell us whether it's this facility. That is this facility, Orange County Correctional Facility. Oh, I'm sorry. I'm sorry. I didn't follow what you were saying. It's fine. Okay. And I would just point out that Farmer, with respect to the notion that there needs to be a persistent history of this type of attack with this modality of weapon and a history within this facility is belied by Farmer itself. Farmer was a first incident issue with a sexual assault that occurred against a transgender, transsexual inmate that exhibited, to quote the Supreme Court, that exuded female characteristics. It wasn't that a bunch of transsexuals had been assaulted by inmates before. It was that the court looked at the common sense notion that if you put a female prisoner with male prisoners, and because male prisoners are known to have proclivities for violence and antisocial conduct, and that rape is generally accepted as one of the unfortunate realities of prison life, that that would create an obvious danger. So, by extension, a male who exudes female characteristics would also create an obvious risk. Well, that's not what we're dealing here. Well, no, no. Let's deal – I want to come back to what you're saying crosses the constitutional line. Is it that they should not have been allowed – no inmate should have been allowed to heat a liquid to a boiling point? I think that is a factual question based on – No, no. What is your claim that this was obvious? Nobody should be allowed to heat liquid to a boiling point. Is that the contention? Your Honor, I would have to, again, say it's subject to discovery because if the discovery parses out that the dozens of inmate incidents that have happened at OCF involved the communal microwave, then, yes, I would say that inmates should not have been allowed at that microwave. That's why it's a factual question that requires discovery. But doesn't that come back to my first question to you? Are you saying they shouldn't have allowed microwaves and you said, no, that wasn't your contention? No, Your Honor, but certainly it's subject to factual discovery.  You're definitely arguing on its face that they shouldn't have allowed. Not that they should have been. You're making the analogy to a knife. A microwave is capable of heating something to a boiling water and boiling water is a weapon. Right. I'm not saying an outright ban. I'm saying actual supervision of the microwave, which there was not. Now I'm very confused. I think what you're saying is that it may turn out that that is the appropriate policy. But standing here today, you can't say that because you haven't had the discovery to figure out how it is that boiling water is misused. Is that? Yes, Your Honor. Yes. So let me ask you this. Presume that the information that your client gave you is wrong and OCC has, in the last 20 years, less than 10 incidents of boiling water. Is there an Eighth Amendment claim to that? Well, it depends if the sheriff is aware of how dangerous boiling water was, whether or not it happened at OCC. Are you aware of boiling water as being dangerous? Not. Would you stick your hand in a boiling pot of water? Agreed, Your Honor. I think most people understand that boiling water is on the dangerous side. That's not what I'm saying. If he understands how frequent inmates are using it. I just gave you a number and I asked you what your reaction to it was. 10 incidents in 20 years. If the policymaker knew that this was an issue, then it wouldn't matter how many incidents happened at OCC. Oh, so it doesn't matter the number? Not specifically at OCC. Would one be enough? If he was aware that this would, no, because it wouldn't be persistent at that point. It wouldn't be pervasive. Would two? I don't know that there's a. I'm trying to figure out. You're asking us to draw a line and you're giving us very little help in drawing it. Well, you're drawing it at the 12B6 stage, Your Honor. I don't think these questions are capable of being drawn so bright line. Farmers certainly does not do that. So, again, the standard under farmer is awareness. It speaks to awareness, subjective awareness. If the policymaker is subjectively aware that inmates use hot water to hurt and assault other inmates and correctional staff, then the policymaker has duties, proactive duties under this court's precedent to establish safety protocols that address that awareness. That they do or that they're capable of doing? That they do have a proactive duty. So your standard is that they have to have done it in the past? That he has to have been aware of the danger. Okay. Thank you so much. Thank you. I'll take this case under advisement.